**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GREGORY WILLIAMS,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 10 C 1051** |
| ) | |
| ) | **Hon. Rebecca R. Pallmeyer** |
| **JASON EDWARDS, KEITH CONNOLLY,** ) | |
| **and the CITY OF CHICAGO** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On February 13, 2008, Plaintiff Gregory Williams was arrested by Defendants, City of Chicago Police Officers Jason Edwards and Keith Connolly (the "Officers"). The Officers found Williams in the driver's seat of a running car, pulled over to the side of the road. The car matched the description given by an anonymous 911 caller, who reported seeing two groups of black men with guns in two different vehicles circling the area of Thomas Street and Karlov Avenue. After the Officers ordered Williams and a passenger from the car at gunpoint and handcuffed them, another officer discovered a gun on the driver's side floor of the car.

Williams, then on parole for a felony drug conviction, was charged with unlawful possession of a weapon by a felon and cited for failure to produce a driver's license. Officer Edwards observed that Williams had been smoking marijuana and apparently seized marijuana in Williams's possession, but Edwards was not charged with a drug offense. Williams spent fourteen months in prison awaiting trial on the felon-in-possession charge. The trial court granted Williams's motion to quash and suppress evidence, concluding that the search incident to arrest that produced the gun was improper. The prosecutors then dismissed the charges, and this civil case followed.

In this civil action, Williams brings claims under 42 U.S.C § 1983 against the Officers and the City of Chicago (collectively, the "Defendants") for false arrest in violation of the Fourth

Amendment and due process violations under the Fourteenth Amendment, and a state law indemnification claim against the City of Chicago pursuant to 745 ILCS 10/9-102. Defendants have moved for summary judgment. For the reasons below, their motion is granted.

## BACKGROUND

At 10:30 p.m. on February 13, 2008, the Office of Emergency Management and Communications ("OEMC") received a call from an anonymous caller who reported seeing two vehicles circling the block in the vicinity of 1100 N. Keeler and 4200 W. Thomas. (Defs.' Joint 56.1 Statement of Undisputed Facts (hereinafter "Defs.' 56.1") ¶ 4.) The caller described the vehicles as a dark green four-door car with temporary plates and a dark green van, also with temporary plates. (*Id.*) In each vehicle, the caller reported seeing two black men with guns. (*Id.*) At 10:39 p.m., OEMC received a second call from an anonymous caller (whether this was the same individual who made the earlier call is not clear), reporting a suspicious automobile in the vicinity of 1100 N. Karlov and 4100 W. Thomas. (*Id.* ¶ 6.) The second caller mentioned two men in a green Chevy with temporary plates; the car was reportedly moving, but the caller did not specify in which direction. (*Id.*) The second caller gave no reason why he or she believed the automobile to be suspicious before hanging up. (Chicago Police Department Event Query No. 0804419766 (hereinafter "766 Event Query"), Attach. to Dunaj Aff., Ex. D to Defs.' 56.1.) The call for police services arising from the first caller's report was classified as Priority 1A, the highest priority call within the Chicago Police Department, indicating that immediate police response is required. (Defs.' 56.1 ¶ 7, 9.)

## I. The Officers' Account

Officers Edwards and Connolly were filling their squad car with gas at a station at Chicago and Pulaski when they heard a "person with a gun" call on their police radio. (*Id.* ¶ 8.) Because they were a few blocks from Karlov and Thomas, and because dispatch issued a priority 1A call, the Officers drove to that area immediately and began circling the block in their squad car. (*Id.* ¶ 9.)

Near the intersection of Karlov and Augusta, the Officers spotted a car matching the 911 callers' descriptions: a green, four-door Chevy with temporary plates. (*Id.* ¶ 11.) According to the Officers, the car was pulled over to the curb and positioned in a manner that made it appear that the car had abruptly exited the flow of traffic rather than parked. (Edwards Dep., Ex. B to Defs.' 56.1, at 15-16, 63; Connolly Aff. ¶ 8, Ex. C to Defs.' 56.1.) The car's lights were off, but the engine was still running. (Defs.' 56.1 ¶¶ 11, 16.)

Officer Edwards positioned the squad car behind the Chevy, activated his emergency lights, and blared his siren briefly. (Edwards Dep. at 16.) Both Officers approached the vehicle with guns drawn. (Pl.'s Statement of Additional Facts (hereinafter "Pl.'s 56.1") ¶ 9.) The Officers contend that they ordered the car's occupants to show their hands, and that when the two male occupants complied, the Officers withdrew and reholstered their weapons. (Defs.' 56.1 ¶¶ 13, 13(a).) Officer Edwards approached the driver's side door and asked the occupant of the driver's seat, Williams, for his driver's license at the same time that he asked him to step out of the car. (Edwards Dep. at 28; Pl.'s 56.1 ¶ 11.) According to Edwards, Williams answered that he did not have a license and, after Williams exited the vehicle, Edwards turned Williams around and directed him to place his hand on the top of the vehicle while Edwards performed a pat-down search for weapons. (Defs.' 56.1 ¶ 14; Edwards Dep. at 28-29.) Edwards then instructed Williams to put his hands behind his back, and Edwards handcuffed him. (Edwards Dep. at 29.) Officer Connolly secured the occupant on the passenger side, William Baldwin. (Connolly Aff. ¶ 12.)

Based on Edwards's experience making hundreds of marijuana arrests, Edwards observed that Williams was under the influence of marijuana. (Defs.' 56.1 ¶ 62.) According to Edwards, Williams eyes were glossy and red, and Williams was laughing and "very nonchalant about the stop." (Edwards Dep. at 63.) Edwards reports that during this encounter, Williams admitted that "he was high as hell." (*Id.* at 63.) In his discovery responses, Williams confirmed that he consumed

marijuana before he was stopped. (Pl.'s Answers to Def. Edwards' First Set of Interrogatories to Pl., Ex. G to Defs.' 56.1, ¶ 15.)

At the time the Officers were securing Williams and Baldwin outside the vehicle, Officer Jose Alvarez and his partner, who were dispatched to respond to the "person with gun" call, arrived at the scene. (Defs.' 56.1 ¶¶ 15-16.) According to Alvarez, while the Defendant Officers' attention was directed toward the car's occupants, Alvarez "leaned into the open front door on the driver's side and immediately saw a gun on the floor. The gun was plainly visible on the floor in the front towards the center but on the driver's side." (Alvarez Aff., Ex. E to Defs.' 56.1, ¶ 6.) Defendant Connolly did not see Alvarez recover the gun (Connolly Aff. ¶ 14), but Edwards testified at the suppression hearing that he saw Alvarez recover the gun from underneath the front seat. (Aug. 13, 2008 Hr'g Tr., Ex. E to Pl.'s Mem. of Law Against Defs.' Mot. for Summ. J., at 6.) When he discovered the firearm, Alvarez announced, "I got it." (Defs.' 56.1 ¶ 18.) According to Edwards, Williams then made a statement that the gun was his or that he would take responsibility for the gun. (Edwards Dep. at 34-35.)

Williams and Baldwin were transported in a squad car to the Eleventh District station. (Defs.' 56.1 ¶ 23.) The entire incident took approximately five to ten minutes. (*Id.* ¶ 24.) Edwards testified that at the station, Williams again made an incriminating statement, explaining, "I got that gun cause I got a lot of people that don't like me." (*Id.* ¶ 25.)

## II.    Williams's Account

Williams gives a slightly different version of the events that day. According to Williams, he had taken the bus to the 1000 block of Karlov to purchase "weed" from a dealer named "Frog." (Williams Dep., Ex. F to Defs.' 56.1, at 36-38.) After purchasing twenty-six bags of marijuana for $200, Williams went into a corner store at Karlov and Augusta to purchase cigars in order to roll the marijuana into "blunts." (*Id.* at 39-41.) Upon exiting the corner store, he saw Baldwin, whom Williams knows as "Ty," sitting in the passenger seat of a Chevy Lumina parked on Karlov. (*Id.* at

4

41-44.) Williams had met Baldwin in 2007 and knew him to be "the man" or "head honcho" in the area, of high rank in the Unknown Vice Lords gang. (*Id.* at 30-31.) Baldwin recognized Williams and the two struck up a conversation, during which Williams asked Baldwin whether he could smoke his blunt in Baldwin's car because it was cold outside. (*Id.* at 49.) Baldwin agreed and Williams got in the driver's seat. (*Id.*) Williams does not remember whether the car was running. (*Id.* at 50.)

Minutes later, Williams saw Officers Edwards and Connolly in the car's side mirror, running towards the car with guns drawn. (*Id.* at 52.) At first, Williams did not realize that they were police officers; he thought that someone had put a "hit" on Baldwin. (*Id.* at 53, 57-58.) Fearing that he would be caught in the crossfire, his initial reaction was to throw his hands up. (*Id.* at 52-53.) Williams denies that the Officers yelled at him to show his hands. (Pl.'s Resp. to Defs.' 56.1 ¶ 13.) Instead, according to Williams, once he realized that Edwards and Connolly were police officers, he kept his hands where the police could see them because, he explained, "I got too many guns in my face, and I don't need no accidents to happen, so I didn't move." (Williams Dep. at 62.) Williams asserts that within seconds, approximately twenty police officers arrived at the scene. (*Id.* at 56-57.)

Williams claims that Officer Edwards opened the driver side door and, as he pulled Williams from the car, assisted by another uniformed officer (not Officer Connolly), demanded that Williams produce his driver's license. (*Id.* at 62-63; Pl.'s 56.1 ¶ 11.) After Connolly pulled Baldwin from the car, the Officers walked both suspects to the back of the car where Edwards performed pat-down searches and handcuffed them. (*Id.* at 63-64.) Williams admits that he informed Edwards that he was in possession of marijuana and that Edwards removed and confiscated the bags of marijuana in Williams's coat pocket. (*Id.* at 64, 71-72.)

While secured at the back of the Chevy, Williams recalls seeing officers search the car. (*Id.* at 67.) Williams claims that he was unaware that the search produced a gun until he was told this

5

by Officer Connolly at the station; he only learned that the gun was found under the driver's seat upon reading the police report. (*Id.* at 79-80, 85.) He denies taking responsibility for the gun at the scene (Pl.'s Resp. to Defs.' 56.1 ¶ 20), and asserts that he in fact denied the gun was his at the station. (Williams Dep. at 81.) Viewed in the light most favorable to the Plaintiff, as the court must do at this stage, the court infers that Williams's statement admitted only the possession of the marijuana, and that he took no responsibility for the gun.

## III.    The Charges

On February 14, 2008, a criminal court judge found probable cause to detain Williams on charges of gun possession by a convicted felon and failure to produce a driver's license. (Defs.' 56.1 ¶ 65.) As a parolee and having been convicted previously of a felony drug violation, Williams was prohibited from possessing a gun. (*Id.* ¶ 63.) As for the license, the Officers had issued a traffic citation for Williams's failure to produce a driver's license. (Citation, Ex. F-1 to Defs.' 56.1.) Williams denies that the Officers issued him a citation and claims that the ticket is fabricated evidence (Williams Dep. at 108, 112), but he admits that the information on the ticket is accurate and that he does not possess a driver's license. (*Id.* at 108-10.)

On February 28, 2008, Williams was indicted by a grand jury on three counts: (1) armed habitual criminal in violation of 720 ILCS 5/24-1.7(a); (2) unlawful possession of a weapon by a felon in violation of 720 ILCS 5/24-1.1(a); and (2) aggravated unlawful use of a weapon in violation of 720 ILCS 5/24-1.6(a)(1). (Indictment, Ex. I to Defs.' 56.1.) It is unclear from the record why prosecutors did not also seek indictment on drug possession charges. At a hearing on Williams's motion to quash and suppress evidence, the court concluded that Williams was arrested for failure to produce a license, and that the search of the car was incident to that arrest. (Aug. 13, 2008 Hr'g Tr. at 16-17.) The judge expressed skepticism that the arrest for the driver's license charge was supported by probable cause; he noted that the Officers never saw the car in motion. (*Id.* at 19-21.) The court nevertheless declined to rule immediately, instead reserving ruling until he had an

opportunity to review case law on the issue.  (*Id.* at 22-23.)  Between that hearing and April 24, 2009, Williams's criminal trial was continued thirteen times, twelve by agreement between the parties.  (Certified Statement of Conviction/Disposition, Ex. J to Defs.' 56.1.)[1]

On April 24, 2009, the trial court granted Williams's motion, citing *Arizona v. Gant*, 556 U.S. 332 (2009).  (April 24, 2009 Hr'g Tr., Ex. K to Defs.' 56.1, at 3.)[2]  As a result, the State dismissed the charges through a nolle prosequi motion.  (*Id.*)

## DISCUSSION

Defendants move for summary judgment on all three of the counts in Williams's complaint: (1) false arrest; (2) due process violations; and (3) state law indemnification against the City of Chicago.  The court grants summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In assessing the record, the court views the facts in the light most favorable to the nonmoving party, here, Williams, and will draw all reasonable inferences in his favor.  *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 456 (7th Cir. 2010).

---

[1]     Overall, the criminal trial was continued eighteen times—fifteen times by agreement between the parties, once on the State's motion, and once on motion of Williams's counsel.

[2]     In *Gant*, the Court held that the search-incident-to-arrest exception to the warrant requirement does not apply to a search of a defendant's vehicle following his arrest for driving with a suspended license where the defendant had been handcuffed and placed in a squad car before the search.  *Gant*, 556 U.S. at 344.  Presumably, the state trial court concluded that the search incident to Williams's arrest was improper because by the time of the search, the Officers had removed the suspects from the car and handcuffed them.  *Gant* does not require exclusion of evidence found in plain view after suspects are already secured following arrest, however.  *See, e.g.*, *United States v. Booker*, 579 F.3d 835, 840 (7th Cir. 2009) (affirming district court's refusal to suppress a gun found in plain view on the floor of a van police stopped on reasonable suspicion of carrying men involved in a battery).  The trial court in this case did not come to a conclusion of fact on whether the gun was found in plain view in the car.  (The prosecutor did not raise the plain view doctrine at the suppression hearing; perhaps the court assumed that the gun was not in plain view.  Such an assumption would find support in Edwards's testimony that he saw Alvarez find the gun under the driver-side front seat; Alvarez did not testify at the suppression hearing.)  If, as Officer Alvarez contends, he found the gun in plain view on the floor, *Gant* would not have required the suppression of evidence in Williams's criminal case.

I.      **False Arrest (Count I)**

As the Seventh Circuit has observed, "'[f]alse arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment." *Gonzalez v. Vill. of W. Milwaukee*, ___ F.3d ___, 2012 WL 313572, at *4 (7th Cir. Feb. 2, 2012) (citing *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)).  In order to prove a false arrest claim under 28 U.S.C. § 1983, Plaintiff must establish that the Officers lacked probable cause to arrest him. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011); *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007).  Accordingly, probable cause to arrest is an absolute defense to a false arrest claim. *Padula v. Leimbach*, 656 F.3d 595, 601 (7th Cir. 2011).  Probable cause, in turn, exists "'if, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (alteration in original) (quoting *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008)).  The probable cause determination is not made from the perspective of an "omniscient observer" *ex post*, but is rather an *ex ante* test based on "the facts 'as they would have appeared to a reasonable person in the position of the arresting officer.'" *Williams*, 509 F.3d at 398-99 (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)); *see also Padula*, 656 F.3d at 601 ("'Critically, the probable cause analysis is an *ex ante* test: the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant as to whether probable cause existed at the crucial time.'" (internal quotation marks omitted) (quoting *Smith v. Ball State Univ.*, 295 F.3d 763, 769-70 (7th Cir. 2002))).

A.      **Probable Cause for a Drug Violation**

The record here amply establishes probable cause for arrest.  After the Officers approached and ordered Williams out of the car, the officers became aware of facts sufficient, at a minimum,

to establish probable cause for a drug violation. Williams acknowledges that he was smoking marijuana moments before the police approached the vehicle; that Officer Edwards, based on his experience making hundreds of marijuana arrests, observed that Williams was high; that Williams admitted that he was high and that he was in possession of marijuana; and that Officer Edwards discovered and confiscated bags of marijuana found on Williams's person. Although Williams was not charged with drug possession, the Supreme Court has rejected "[t]he rule that the offense establishing probable cause must be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). As the Seventh Circuit has observed, "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007).

Plaintiff claims that he was under arrest at the moment the Officers ordered him out of the car. Therefore, he contends, the Officers' subsequent discovery that Williams had smoked marijuana could not be used to justify that arrest. Plaintiff is correct that "[t]he fact that an officer later discovers additional evidence unknown to her at the time of the arrest . . . is irrelevant—[the court] only care[s] about what the officer knew at the time the decision was made." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007); *see also Carmichael*, 605 F.3d at 457-58. But under *Terry v. Ohio*, 392 U.S. 1 (1968), probable cause for an arrest can be based on evidence obtained during a brief investigatory detention that is limited in scope and supported by reasonable suspicion that a crime has been, is, or is about to be committed. *See, e.g.*, *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011).

Such a *Terry* stop "'must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests.'" *Id.* at 1015 (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir.

1994)).  In evaluating the proper scope of a *Terry* stop, the court considers "the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation."  *Id.*  If a *Terry* stop exceeds its proper scope, either by continuing too long or becoming unreasonably intrusive, it "can ripen into a de facto arrest," which would require probable cause.  *Id.* at 1015-16 (citing *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)).

In this case, the law enforcement purpose for a *Terry* stop was to investigate a 911 caller's report of four suspects with guns in two vehicles circling the block.  Williams contends that the stop became an arrest when he was ordered from the car at gunpoint, handcuffed, and placed in the back of a squad car.[3]  But the Seventh Circuit has recognized that even "using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances."  *Id.* at 1016.  Such actions are proper when "used to meet the officers' legitimate interest in safety and security."  *Id.*; *see also United States v. Snow*, 656 F.3d 498, 503-04 (7th Cir. 2011) (holding that officers were not obligated to question a suspected burglar before frisking the suspect because "the purpose of a protective frisk is to ensure the safety of the officer and others during the investigative detention").  Given that the Officers were responding to a gun call, it was reasonable to approach the car with guns drawn, to order Williams out of the car, and to handcuff him.  Furthermore, the investigative stop lasted only five to ten minutes and Williams was not transported to any other location during the course of the stop.

Even if the court were to determine that the *Terry* stop was unsupported by reasonable suspicion, the evidence of drug possession procured through the illegal detention could still support

---

[3]     It is unclear from the record at what point Officers placed Williams in the squad car. Even viewed in the light most favorable to Williams, Edwards's discovery of facts that support probable cause for a drug violation appears to have occurred before Williams was placed in the squad car.

a finding that there was probable cause for a subsequent arrest. Unlike in criminal proceedings, where evidence obtained as a result of illegal searches and seizures can be excluded as "fruit of the poisonous tree," several courts of appeals have declined to extend the exclusionary rule to civil cases brought under § 1983. In *Townes v. City of New York*, for example, the Second Circuit observed that "[t]he fruit of the poisonous tree doctrine . . . disregards traditional causation analysis to serve different objectives" and that "[t]o extend the doctrine to § 1983 actions would impermissibly recast the relevant proximate cause inquiry to one of taint and attenuation." 176 F.3d 138, 146 (2d Cir. 1999). Likewise, the Third Circuit refused to extend the exclusionary rule to § 1983 actions, noting numerous exceptions to the exclusionary rule recognized by the Supreme Court. *Hector v. Watt*, 235 F.3d 154, 158 (3d Cir. 2000) (collecting cases). A number of courts within this circuit have reached the same conclusion. *See Swanigan v. Trotter*, No. 7 C 4749, 2011 WL 658156, at *3 (N.D. Ill. Feb. 14, 2011) (Kendall, J.); *Williams v. Carroll*, No. 08 C 4169, 2010 WL 5463362, at *4 (N.D. Ill. Dec. 29, 2010) (Zagel, J.); *Brinson v. Syas*, 735 F. Supp. 2d 844, 852 (N.D. Ill. 2010) (Norgel, J.); *Rivera v. Burke*, No. 06 C 0734, 2008 WL 345612, at *5 (N.D. Ill. Feb. 7, 2008) (Cox, J.); *Bradshaw v. Mazurski*, No. 03 C 2074, 2004 WL 170337, at *6 (N.D. Ill. Jan. 15, 2004) (Gettleman, J.). This court is likewise persuaded. The court concludes that the undisputed evidence of Williams's drug use and possession establishes probable cause for his ultimate arrest regardless of whether the initial stop was constitutionally valid.

Of course, the evidence of a drug violation cannot be used to support the initial *Terry* stop because that evidence was unknown to the Officers at the time. Therefore, the central question upon which liability for the *Terry* stop turns is whether the Officers were justified in deciding to initially seize Williams when they observed him in a car matching the 911 caller's description. If not, Defendants may be liable for false arrest for an improper investigative detention.

The court turns, then, to the question whether the Officers had the reasonable suspicion necessary for a *Terry* stop. Before doing so, the court pauses to note that, if Plaintiff were to prevail

on that issue, his damages would be minimal. The Supreme Court has held that the damages a court may award under § 1983 depends on "the nature of the interests protected by the particular constitutional right in question." *Carey v. Piphus*, 435 U.S. 247, 265 (1978). The Second Circuit has observed that in the Fourth Amendment context, "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes*, 176 F.3d at 148; *accord Hector*, 235 F.3d at 157. The Third Circuit, similarly, has concluded that where a civil case arises from an unlawful search or seizure, evidence recovered during the search is admissible. To exclude such evidence, the court held, would "impose potential liability out of proportion to the errors committed"; "the officer who took a frisk one modest step too far could face vast liability, liability that bears no relationship to the seriousness of the invasion of privacy." *Hector*, 235 F.3d at 159-60.

Thus, both the Second and Third Circuits have held that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Townes*, 176 F.3d at 148; *accord Hector* 235 F.3d at 147. The Seventh Circuit cited *Townes* and *Hector* with approval in a case in which the court concluded that damages for false arrest are limited to "harm [the criminal defendant] incurred from the false arrest before he was charged." *Gauger v. Hendle*, 349 F.3d 354, 362-63 (7th Cir. 2003), *abrogated on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 427 (7th Cir. 2006); *cf. Bielanski v. Cnty. of Kane*, 550 F.3d 632, 638 (7th Cir. 2008) (reaffirming the "well-settled rule that 'the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects.'" (quoting *Wallace*, 440 F.3d at 998)). Consequently, while Williams might be entitled to damages for harm he suffered as a result of being unlawfully removed from the car at gunpoint, he would not

be able to recover for his fourteen-month incarceration before the charges against him were dropped.

### B. Reasonable Suspicion for the *Terry* Stop

Plaintiff contends that information furnished by the 911 caller is insufficient as a matter of law to establish reasonable suspicion to detain him. Plaintiff likens the facts supporting his stop to the facts present in *Florida v. J.L.*, 529 U.S. 266 (2000). In *J.L.*, police received a tip from an anonymous caller that "a young black man standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. The call was not recorded and the caller gave no explanation of his or her reason for knowing that the man possessed a gun. *Id.* When police arrived at the bus stop, they observed three black men, one of whom was wearing a plaid shirt. *Id.* The police had no other reason to suspect any of the three other than the information given in the anonymous tip; the officers did not observe a weapon and the man in the plaid shirt made no threatening or unusual movements. *Id.* The police stopped and frisked all three men, finding a gun in the pocket of the one wearing a plaid shirt. *Id.*

The Supreme Court held that the officers lacked reasonable suspicion to justify the frisk. *Id.* at 274. The Court reasoned that "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 270 (citations omitted) (internal quotation marks omitted). The Court concluded that the tip lacked "'sufficient indicia of reliability to provide reasonable suspicion to make the investigative stop,'" *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)), when "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. It did not matter that the tip accurately described the location and the person who possessed the gun because reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. The Court cautioned, however, that its

holding did not apply to "circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.* at 273. The Court noted that it was not suggesting that "a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." *Id.* at 273-74.

Defendants contend that *J.L.* is distinguishable on three grounds: (1) that the 911 callers in this case were not truly anonymous; (2) that the emergency nature of the 911 callers' reports justified immediate police response without further need for verification; and (3) that the officers are, at any rate, entitled to qualified immunity.[4] The court considers these arguments in turn.

### 1. Anonymity of the 911 Callers

In *J.L.*, the Supreme Court compared the reliability of a tip from an anonymous caller, which was not recorded, to that of "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *J.L.*, 529 U.S. at 270. Justice Kennedy, joined by Chief Justice Rehnquist, noted in his concurrence that there was no indication in that record "whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number." *Id.* at 275 (Kennedy, J., concurring). Kennedy speculated that among the features of an anonymous tip that might support reliability, "the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." *Id.* at 276.

---

[4]     Additionally, Defendants address Plaintiff's argument that the callers' reports were unreliable because they give inconsistent information. As the court reads the 911 operator's summaries of the reports, however, the two callers' reports were not inconsistent. The first caller reported two groups of two men in different vehicles (a green van and a green four-door sedan, both with temporary plates); the second caller mentioned one vehicle, a green Chevy with temporary plates, which matched the description of one of the vehicles mentioned by the first caller. Contrary to Plaintiff's assertion, neither of the 911 callers mentioned "a single black male walking with a gun." (Pl.'s Mem. of Law Against Defs.' Mot. for Summ. J. at 7.)

The Seventh Circuit has recognized that the holding in *J.L.* applies only to tips from anonymous informants. Where a caller provides the 911 operator with identifying information, such as his or her name, telephone number, and location, a number of courts of appeals have declined to apply *J.L.*, finding the informant's tips to be reliable because police can hold the caller responsible if the tip turns out to be false. *See United States v. Hicks*, 531 F.3d 555, 559 (7th Cir. 2008) (collecting cases). In an unreported decision, the Seventh Circuit further held that "[t]he recording, transcribing, and tracing of [anonymous] calls provides the indicia of reliability that was lacking in *J.L.*" *United States v. Blair*, 25 F. App'x 472, 474 (7th Cir. 2002). The Seventh Circuit appears to have subsequently called into question the reasoning in these cases, however. In *United States v. Wooden*, the court noted that a caller who gives his or her name does not necessarily make the tip less anonymous because the caller could be lying. 551 F.3d 647, 649 (7th Cir. 2008). The *Wooden* court further noted that "[c]aller ID does not solve this problem for public phones or even home phones, which can be used by multiple people (including guests at a party); some subscribers block the service. Cell phones, which almost always use caller ID, can be stolen." *Id.* at 650. Subsequent cases appear to apply *Hicks* without mentioning the difficulties in identifying a caller mentioned in *Wooden*, however. *See United States v. Fields*, 373 F. App'x 624, 627 (7th Cir. 2010); *United States v. Hampton*, 585 F.3d 1033, 1039 (7th Cir. 2009).

Defendants nevertheless urge that *J.L.* is not controlling here because the callers were not truly anonymous. They point to the 911 operator records, which feature redactions for the callers' names and phone numbers. (Chicago Police Department Event Query No. 0804419614, Attach. to Dunaj Aff; 766 Event Query.) But these records do not reveal whether the callers identified themselves to the 911 operator. Viewed in the light most favorable to Plaintiff, these records demonstrate only that, had the 911 operator wished to do so, he/she could have traced the calls using caller ID. This court is unwilling to conclude that caller ID alone suffices to render an otherwise anonymous call reliable, especially in light of the Seventh Circuit's observations in

*Wooden*. Furthermore, the record in this case is distinguishable from that in *Blair* because there is no evidence here that the call was recorded or transcribed, which would give the police greater ability to hold a caller responsible for false information by allowing the police to identify the caller based on the caller's voice and manner of speech.

Neither is reliability established by the number of tips in this case. The Seventh Circuit has recognized that multiple anonymous tips can bolster the reliability of the information. *See Hampton*, 585 F.3d at 1040 (concluding reasonable suspicion based on multiple 911 calls reporting a shooting); *United States v. Whitaker*, 546 F.3d 902, 909 (concluding reasonable suspicion based on two 911 calls in close succession); *Blair*, 25 F. App'x at 474 ("The presence of four independent calls repeating similar information made the information more reliable than one uncorroborated, anonymous tip."). But in this case, the paucity of information provided by the second 911 caller limits that call's ability to enhance the reliability of the first. The second caller provided even less information than the caller in *J.L.*—the caller gave no reason why he or she thought the green Chevy was suspicious. Further, the Seventh Circuit has held that a call reporting a "suspicious person" alone is insufficient to justify a *Terry* stop. *See Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). The court concludes that the callers were anonymous and that this case cannot be distinguished from *J.L.* on that basis.

### 2.    Reliability of Eyewitness Reports of an Ongoing Emergency

Defendants second argument is that the anonymous calls gave police reasonable suspicion because they revealed exigent circumstances. Picking up on the Supreme Court's bomb example, the Seventh Circuit is among a number of courts to have distinguished *J.L.* when the caller reports an ongoing emergency. *See Hicks*, 531 F.3d at 558-59 ("Every circuit to consider the question, including this one, has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency or very recent criminal activity." (citations omitted)). Recognizing that public safety may be sacrificed if police are required to identify a 911 caller or corroborate the caller's

report in all situations, the Seventh Circuit holds that for emergency situations, police are entitled to presume that the report by an eyewitness is reliable. *See United States v. Drake*, 456 F.3d 771, 774-75 (7th Cir. 2006). This presumption is not simply an emergency exception, but is "rooted in the special reliability inherent in reports of ongoing emergencies." *Hicks*, 531 F.3d at 559-60; *see also Wooden*, 551 F.3d at 649 ("[P]eople who report crimes do not invariably claim 'inside information' (as the tipster in *J.L.* . . . did). . . . [T]he assertions of eyewitnesses to crime generally do not need corroboration, or a history of other accurate reports, to be believed."). Thus, the Seventh Circuit distinguishes anonymous reports in emergency situations from the report of general criminality presented in *J.L.*, where the call suggested that the defendant possessed a gun illegally, but did not give the police any reason to believe that the defendant intended to use the gun to commit a crime. *See Hicks*, 531 U.S. at 558-59.

Where there is a basis for suspicion that there may be a shooting, the circumstances suggest an emergency. For example, the Seventh Circuit has applied this emergency exception where an eyewitness caller, who later identified herself, reported two groups (four men in a Cadillac and two women in a LeSabre), both of whom had guns, and that one had threatened her son-in-law with a gun. *Drake*, 456 F.3d at 772. Although the court noted that the caller was not truly anonymous, the court concluded that "[i]t is enough . . . that [the caller] reported an immediate threat to public safety and that she provided sufficient details to allow the officers to identify the suspects." *Id.* at 775; *see also Hampton*, 585 F.3d at 1038-40 (concluding reasonable suspicion where multiple callers reported shots fired and one caller was able to provide the operator with the movements of the shooter's SUV); *Whitaker*, 546 F.3d at 909 (concluding reasonable suspicion where two callers in close succession reported an altercation at a store parking lot and police found vehicles at the scene matched the descriptions); *Hicks*, 531 F.3d at 560 (concluding reasonable suspicion where a caller reported that a man involved in a domestic disturbance with a woman had threatened her with a gun in the caller's home). The court has applied the emergency exception

17

where the 911 caller was truly anonymous. *See Wooden*, 551 F.3d at 650 (concluding reasonable suspicion where an anonymous caller reported witnessing a man threaten a woman with a gun during an argument).

To summarize, these cases establish that the emergency exception clearly applies where an anonymous caller reports shots fired or that the caller witnessed someone threaten another with a gun. But in a recent unreported decision, the Seventh Circuit applied the emergency exception to a situation more analogous to this case, where a caller reports witnessing a person in possession of gun under suspicious circumstances that indicate the possibility of imminent criminal activity. In *United States v. Fields*, a frightened caller reported witnessing a group of men with two vehicles gather in an alley in view of the caller's home. 373 F. App'x at 625. The caller further reported that one of the men displayed what looked like a "big gun." *Id.* In challenging the denial of his motion to suppress a gun discovered behind the front passenger seat of a car matching the caller's description, one of the men argued that the caller's report was one of mere "general criminality," insufficient to justify a *Terry* stop. The court observed, however, that "[h]er report of these details, and her fear of the events that were potentially developing outside of her home, alerted the police to the possibility of a violent disturbance." *Id.* at 628;[5] *see also United States v. Saddler*, 275 F. App'x 549, 551 (7th Cir. 2008) (finding reasonable suspicion where a store owner called 911 to report that one of his employees saw a man with a concealed firearm in the store and police stopped a man who fit that description a couple of blocks away).

In the case before the court, the report of the first 911 caller appears closer to the facts in those cases applying the emergency exception than to the facts of *J.L.* Unlike the anonymous caller in *J.L.*, who gave the police no explanation of how he or she knew that the young man at the bus stop possessed a gun, the 911 operator's dispatch reports that the first caller in this case had

---

[5]     Additionally, the *Terry* stop was justified when the suspect gave evasive answers to officers when they approached and asked him whether he possessed a gun.

seen both groups of men with guns. Given the detail with which the caller reported the situation—the number of men in each vehicle, the vehicle types and color, the fact that both vehicles had temporary plates, and the observation of weapons—it was reasonable for the police to infer that the caller was an eyewitness. Moreover, the call in this case went beyond a mere report of "general criminality." A report of multiple men with guns in two vehicles constitutes a situation that is more likely to lead to violence than a report of a single person carrying a firearm. The threat of an imminent crime was heightened by the report that the vehicles were circling the block. Additionally, even though the second 911 call provides no independent basis for concluding that the situation constituted an ongoing emergency, the fact that police received a second call within ten minutes of the first further underscores the urgency of the situation.

Furthermore, the first caller's report provided sufficient details to allow the Officers to identify the suspect. Upon arriving in the vicinity of the area described by the caller, the Officers observed a car that matched the caller's description: a green, four-door sedan with temporary plates occupied by two black men. Although the automobile was pulled over to the side of the road, its engine was running, which was consistent with the caller's report that the vehicles had been circling the block. Because these circumstances suggested an emergency, the first 911 caller's report was entitled to a presumption of reliability.

If the issue were dispositive, the court might well conlude that the Officers had reasonable suspicion suffcent to support a *Terry* stop. As explained below, however, the court need not resolve the dispute; the fact that the question is a difficult one requires the conclusion that the officers are shielded by qualified immunity.

### 3. Qualified Immunity

Application of the emergency exception for anonymous 911 calls may be a close question under the facts of this case, which appear to fall somewhere between the facts in *J.L.* and the facts in Seventh Circuit cases applying the exception. Defendants argue that even if the Officers lacked

reasonable suspicion to conduct the *Terry* stop, they are entitled to qualified immunity, and the court agrees.

Qualified immunity shields "officers sued under § 1983 . . . 'when they act in a manner that they reasonably believe to be lawful.'" *Brooks v. City of Aurora*, 653 F.3d 478, 483 (7th Cir. 2011) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009)).  The court asks "(1) whether [Williams's] allegations make out a deprivation of a constitutional right and (2) whether the right was clearly established at the time of [the Officers'] alleged misconduct." *Id.* (internal quotation marks omitted) (citation omitted).  The court may address this two-prong test in any order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "Although qualified immunity is an affirmative defense, once raised, it become the plaintiff's burden to defeat it." *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010).

As discussed above, the Officers possessed probable cause to arrest Williams at the point they discovered that he had consumed and possessed marijuana. Therefore, Williams cannot make out a false arrest claim for an arrest that occurred after that point.  As for the *Terry* stop, even if Plaintiff is correct that the Officers lacked reasonable suspicion and the stop constituted an unconstitutional seizure, there is no clearly established law that the situation as reported to the Officers—two groups of mens carrying firearms visible to witnesses and circling a block in two automobiles—does not constitute an emergency that merits police response without further verification.  These facts make the first caller's report distinguishable from the bare-bones anonymous tip in *J.L.*  In the absence of clearly established law defining the grey area between emergency situations and reports of general criminality, the Officers acted reasonably in presuming that the caller's tip was reliable as an eyewitness report of an emergency situation that could lead to imminent gun violence.

The only case Plaintiff cites in support of his argument that the Officers did not act reasonably is *Carmichael v. Village of Palatine*, 605 F.3d 451 (7th Cir. 2010).  In *Carmichael*, the

Seventh Circuit held that qualified immunity was not available to an officer who arrested a passenger and driver who were later found to be abusing drugs and alcohol. *Id.* at 459. In that case, the officer initially cited a traffic violation as a justification for stopping the plaintiffs; but the facts of that purported violation were unknown to the officer at the time of the stop. *Id.* Similarly, the officer claimed another traffic violation was the basis for the stop after the arrest, but that violation was based on facts that were untrue. *Id.* In those circumstances, the court concluded "there is simply no basis in the record upon which a determination of probable cause can be sustained. Certainly, any reasonable police officer . . . would have known this elementary principle of the law of arrest." *Id.* at 459-60. *Carmichael* is inapposite because this case does not involve an arrest resulting from a pretextual traffic stop. Rather, this case involves reasonable suspicion based on a 911 dispatch reporting an emergency situation. Consequently, Plaintiff has not met his burden of demonstrating that the Officers violated a clearly established constitutional right against a brief investigative detention under these circumstances.

For the reasons above, Defendants' motion for summary judgment is granted with respect to Plaintiff's false arrest claim (Count I).

## II.    Due Process (Count II)

In Count II of his complaint, Plaintiff alleges that Defendants violated his due process rights by using fabricated evidence to secure his indictment, resulting in fourteen months' imprisonment before the state trial judge granted Plaintiff's motion to quash and suppress. Specifically, Plaintiff alleges that the fabricated evidence consisted of evidence that he was in possession of a gun and that he had made incriminating statements concerning the gun. (Williams Dep. at 115-16.) Defendants contend that they are entitled to summary judgment as a matter of law. Again, the court agrees.

Plaintiff's due process claim is directly controlled by the Seventh Circuit's decision in *McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003). In *McCann*, the plaintiff alleged that

defendant-officers manufactured evidence "for the purpose of having [the plaintiff] prosecuted, convicted and imprisoned." *Id.* at 786. The court interpreted the claim to be "combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment." *Id.*; *accord Brooks v. City of Chicago,* 564 F.3d 830, 833 (7th Cir. 2009); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010). *Id.* The court concluded that such a claim was not cognizable. To the extent that the due process claim sounded in false arrest, the court noted that "[t]he Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision (here the Fourth Amendment) protects the right allegedly violated." *Id.* (citing *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Furthermore, to the extent that his claim was in essence one of state law malicious prosecution, the court observed that "'the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution,' and Illinois has a common law tort action for malicious prosecution." *Id.* (citation omitted) (quoting *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001)).

Plaintiff is correct that this line of precedent does not preclude a due process claim for violations under *Brady v. Maryland*, 373 U.S. 83 (1963). As the Seventh Circuit held in *Newsome*, the precedential decision on which the *McCann* court relied, a plaintiff may still bring "a due process claim in the original sense of that phrase—he did not receive a fair trial if the prosecutors withheld material exculpatory details." *Newsome*, 256 F.3d at 752. Other decisions Plaintiff cites allowed due process claims to go forward when predicated on *Brady* violations or other deprivations of a right to a fair trial, derived from the language of the Constitution itself. *See Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *12 (N.D. Ill. Feb. 2 , 2006); *Patterson v. Burge*, 328 F. Supp. 2d 878, 890 (N.D. Ill. 2004). But as the *Newsome* court observed, *"Brady* identifies a trial right." *Newsome*, 256 F.3d at 752; *see also McCann*, 337 F.3d at 787 ("The Court has yet to address . . .

whether the Due Process Clause requires such disclosures outside the context of a trial."); *cf.*
*Tillman v. Burge*, 813 F. Supp. 2d 946, 960 (N.D. Ill. 2011) (declining the plaintiff's invitation "to look
beyond the ambit of *Brady* and allow him to pursue a claim that he was deprived of a substantive
due process right to not be tried and convicted on the basis of fabricated evidence"). Because
prosecutors dropped all charges against Williams prior to trial, Plaintiff cannot claim that he was
denied a fair trial as a result of withheld exculpatory evidence. Plaintiff has not brought a state law
malicious prosecution claim. Because he cannot state a claim for *Brady* violations, his due process
claim is nothing more than a rearticulation of his Fourth Amendment false arrest claim.

Moreover, Williams does not claim that the gun did not exist or that the Officers planted the
gun. Indeed, Williams does not appear to contest that the Officers discovered the gun on the floor
of a car in which Williams was found sitting in the driver's seat. For purposes of summary
judgment, the court assumes that Williams never acknowledged that the gun was his, but the
Officers were not required to believe him. Therefore, to the extent that Williams's due process
claim is really just an extension of his false arrest claim, it fails because these uncontested facts
were sufficient to establish probable cause for his arrest. Consequently, Defendants' motion for
summary judgment is granted with respect to Plaintiff's due process claim (Claim II).

### III.    State Law Indemnification Claim (Count III)

Finally, Plaintiff's state law indemnification claim against the City of Chicago fails as a matter
of law because Plaintiff has not established liability against any of the City's employees. The Illinois
Local Government and Governmental Employees Tort Immunity Act directs municipalities to pay
tort judgments and settlements for the liability of municipal employees acting within the scope of
their employment. 745 ILCS 10/9-102. But Illinois law exempts public entities from liability "for any
injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS
10/2-109. Because the court concludes that the Defendant Officers are entitled to summary
judgment on Counts I and II, Plaintiff has not established the employee liability necessary for

indemnification.  Consequently, Defendants' motion for summary judgment is also granted with respect to Count III.

## **CONCLUSION**

For the reasons above, Defendants' motion for summary judgment [23] is granted.

ENTER:

Dated:  March 22, 2012

_____

REBECCA R. PALLMEYER
United States District Judge